**SEALY CONNECTICUT, INC.,**

v.

**LITTON INDUSTRIES, INC. et al.**

No. 3:94CV711(JBA).

United States District Court,
D. Connecticut.

Feb. 9, 2000.

Franca L. Derosa, Brown, Rudnick, Freed & Gesmer, Hartford, CT, for Sealy Connecticut, Inc.

Thomas J. Byrne, Thomas A. Rouse, Brian C. Roche, Pullman & Comley, Bridgeport, CT, Lawrence J. golden, pullman & Comley, Hartford, CT, for Litton Industries, Inc., Litton Systems, Inc.

Sharon A. Cregeen, David J. McDonald, Westport, CT, James Edward O'Donnell, O'Donnell, McDonald & Cregeen, Westport, CT, for U.S. Baird Corp.

James G. Green, Jr., R. Bradley Norris, Pepe & Hazard, Hartford, CT, Luigi D. Vissicchio, Geoffrey W. Millsom, William Charron, Orrick, Herrington & Sutcliffe, New York City, for American Home Products Corp.

### Memorandum of Decision–Phase I

ARTERTON, District Judge.

Plaintiff Sealy Connecticut, Inc. ("Sealy") has brought suit to recover its remediation costs under Section 107 [1] of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a) ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(A), (a)(1)(B) and invokes supplemental jurisdiction over its state law claims [2] including Conn.Gen.Stat. § 22a–452. It seeks to recover its cost of remediating the soil and groundwater contamination on a part of the real property it owns in Watertown, Connecticut (the "Winchester Site"). The defendants, Litton Industries, Inc.; Litton Systems, Inc. d/b/a Winchester Electronics, Division of Litton Systems, Inc.; U.S. Baird Corporation f/k/a the Baird Machine Company; and American Home Products Corporation, are each alleged to have formerly owned, operated and/or controlled industrial facilities on the site whose operations are alleged to have resulted in the present contamination.

With agreement of the parties, the Court bifurcated this case to consider in Phase I the sole issue of "what portion of Sealy's remediation costs [to date and in the future] would be recoverable under CERCLA and the analogous provisions of Conn.Gen.Stat. § 22a–452." *See* Scheduling Order, dated Dec. 21, 1998 (Doc. # 144); Status Report on Scheduling Conference and Parties' Proposal Regarding Bifurcation of Trial, (Doc. # 142). For purposes of the Phase I trial only, the

---

1. In Sealy's Second Amended Complaint, Count One is brought under 42 U.S.C. § 9607(a). However there is some dispute as to whether Sealy can proceed under this section since, if Sealy is a potentially responsible party, it would be limited to a contribution action under 42 U.S.C. § 9613(f)(1). *See Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir. 1998). Since the elements for claims brought under section 9607(a) and Section 9613(f)(1) are identical, *see id.* at 427, the Court need not determine in Phase I whether Sealy is a potentially responsible party, nor whether Sealy's claim should be construed under Section 9613 notwithstanding the fact that the Second Amended Complaint only alleges a claim under Section 9607(a). *See Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir.1999) (identifying but not deciding issue of whether potentially responsible plaintiff, who only pleads and proceeds at trial under Section 9607, may nonetheless recover under Section 9613).

2. Sealy's other state law claims are: absolute nuisance (Count Three); negligent nuisance (Count Four); Conn.Gen.Stat. § 52–481 (Count Five); breach of lease as to Litton (Count Seven); waste as to Litton under Conn.Gen.Stat. § 52–563 (Count Eight); trespass (Count Nine); negligence (Count Ten); and negligence per se (Count Eleven). *See* Fourth Am. Compl. (Doc. # 124).

Court assumes CERCLA and Conn.Gen. Stat. § 22a–452 liability, and defers resolution of all other issues "including liability, apportionment of remediation costs between the parties under CERCLA, and Conn.Gen.Stat. § 22a–452, Sealy's other claims of non-remedial damages and any defense which may be asserted." *Id.* at 2, to Phase II.

This memorandum of decision contains the Court's findings of fact and conclusions of law based on the evidence presented at the Phase I bench trial completed on May 25, 1999.

### Site Description and Chronology of Remedial Actions

Plaintiff Sealy owns the Winchester Site which is located at the intersection of Riverside Street and Hillside Avenue in the village of Oakville in the town of Watertown, Connecticut. Sealy also owns a five-acre parcel of real estate adjacent to the Winchester Site where Sealy previously assembled mattresses ("Sealy Site"). Since the late nineteenth century, various manufacturing activities have been performed by various owners, tenants and occupiers of the Winchester Site. *See* Former Winchester Facility Chronology Study (Pl.'s Ex. 177). Most recently the Winchester Site served as the location of Litton's Winchester Electronics manufacturing facility until Litton closed its operations after its lease with Sealy expired in July 1991. Since the time Litton vacated, the Winchester Site has remained vacant. Until late 1997, the Winchester Site contained an industrial building ("Winchester Building") comprised of a series of structures of varying ages, heights and construction materials reflecting the various industrial uses conducted on the site since 1905. *See* Abram Test. Tr. at 26.

In December 1986, when Sealy took title to the site, Sealy filed a "Form III"[3] declaration with the Connecticut Department of Environmental Protection ("DEP") under the Connecticut Transfer Act, Conn. Gen.Stat. § 22a–134 et seq., ("Transfer Act") based on its belief that there might be hazardous waste at the Winchester Site given its prior uses and thus it could not in good faith file a "Form I" statement attesting to the absence of contamination or a "Form II" statement that remediation had already occurred and was complete. Subsequently, Sealy filed additional "Form III" declarations with the DEP in 1991, 1993 and 1997 triggered by changes in its stock ownership and a series of corporate reorganizations.

In October 1990, Sealy retained Dames & Moore, an environmental consulting firm, to conduct a Phase I Environmental Site Assessment of the Winchester Site. (Pl.'s Ex. 4.) From March through June 1991, Sealy retained TRC Environmental Consultants, Inc. ("TRC,") to prepare the Winchester Site foreclosure upon lease expiration. (Pl.'s Ex. 21.) In October 1992, the DEP conducted an unannounced inspection of the Winchester Site. In November 1992, Dames & Moore performed further site investigation of the Winchester Site. In January 1993, the United States Environmental Protection Agency ("EPA") contacted Sealy to conduct a site inspection of the Winchester Site by an outside inspector, Roy F. Weston. In February 1993, Dames & Moore provided Sealy with a Phase I Environmental Site Assessment, (Pl.'s Ex. 34), and Subsurface Investigation Report (Pl.'s Ex. 35). The Dames & Moore Subsurface Investigation Report indicated the presence of contaminants in the soil and ground water. In June 1993, DEP issued Sealy a Notice of Violation of

---

**3.** The "Form III" is "a written certification signed by a certifying party on a form prescribed and provided by the commissioner, which certification states that (A) a discharge, spillage, uncontrolled loss, seepage or filtration of hazardous waste has occurred at the parcel or the environmental conditions at the parcel are unknown, and (B) that the person signing the certification agrees to investigate the parcel in accordance with prevailing standards and guidelines and to remediate the parcel in accordance with the remediation standards." Conn.Gen.Stat. § 22a–134.

the Winchester Site based on its October 1992 inspection and report and advised Sealy that "in the event Winchester does not address this waste, enforcement action may be taken against Sealy since they are the landowner." (Pl.'s Ex. 38).

In November 1993, Dames & Moore conducted additional onsite sampling whose preliminary results revealed further contamination of the soil beneath the concrete floor of the Winchester Building. In early 1994, the EPA designated CDM Federal Programs Corp. ("CDM") as the contractor to inspect the Winchester Site under the EPA's CERCLA program. On April 29, 1994, Sealy commenced this action against the Defendants and served copies of the complaint on the EPA and DEP.

In May 1994, CDM inspected the Winchester Site and in August 1994, notified Sealy of its intent to conduct further investigation, including soil sampling. In September 1994, Sealy and Defendants agreed to have Tighe & Bond, another environmental consultant, proceed with a limited site assessment and thus the EPA agreed not to proceed with CDM's investigation pending the results of Tighe & Bond's investigation. In November 1994, Tighe & Bond issued its report entitled, "Additional Site Assessment Investigation Report" which revealed evidence of soil contamination of heavy metals, such as cadmium, chromium, copper, lead, nickel, zinc and cyanide, etc., and total petroleum hydrocarbons ("TPH"). (Pl.'s Ex. 125.) In December 1994, Sealy retained Fletcher Thompson, Inc. ("Fletcher Thompson") to perform a historical study of the Winchester Site and chronology of the construction and manufacturing activities which had taken place on the site since 1905. In January 1995, Tighe & Bond proposed performing additional work at the Winchester Site to characterize the extent of contamination uncovered in its previous investigation and in April 1995, and revised its supplemental investigation plan to incorporate suggestions made by Dames and Moore and the DEP. At this point, the Defendants advised Sealy that they would not agree to implementation of the Tighe & Bond Supplemental Investigation plan. In May 1995, Sealy engaged environmental consultant, ABB Environmental Services, Inc. ("ABB"), with EPA's permission, to undertake the activities proposed by the Tighe & Bond Supplemental Investigation. Also in May, Fletcher Thompson completed at Sealy's request its "Former Winchester Facility Chronology Study for the Winchester Site." See Pl.'s Ex. 177. In July 1995, ABB concluded its additional investigation and reported its findings of further evidence of heavy metal contamination and volatile organic compounds ("VOC"). See Pl.'s Ex. 187. In September 1995, ABB prepared a remedial Action Plan ("September RAP") for the Winchester Site based on all prior investigations conducted by Dames & Moore, Tighe & Bond and ABB. See Pl.'s Ex. 205.

On November 22, 1995, Sealy contracted to sell the Winchester Site to Devlom, a private developer. Under the terms of the sale contract, Devlom would demolish the Winchester Building at its own expense and Sealy would remediate the contamination. In December 1995, CDM issued its final report on the Winchester Site, see Pl.'s Ex. 234, and thereafter EPA notified Sealy that the Winchester Site would not be listed on the National Priorities List as a superfund site and the EPA would defer to the DEP's jurisdiction over the site.

In January 1996, the DEP finalized its Remediation Standard Regulations, Conn.Agencies Regs. § 22a–133k–1, et seq. ("RSRs"). See Defs.' Exs. 406, 407. In January 1996, Sealy and Devlom met with the DEP to discuss the plans for remediation and redevelopment of the Winchester Site. During the next several months, the September RAP was distributed to and commented on by the DEP and Defendants, and was subsequently revised in a document entitled the remediation Plan of April 1996 ("April RAP"). See Pl.'s Ex. 268. As of April 1996, the

known site contaminants were principally heavy metals (arsenic, cadmium, chromium, lead, cyanide) and TPH. Although some polynuclear aromatic hydrocarbons (PAH, a volatile organic compound) was detected, its presence was dismissed as an isolated event. (Pl.'s Ex. 268 at 4–16.) In the April RAP, Sealy considered various remedial alternatives for the known soil and ground water contamination and identified two feasible alternatives for soil remediation: 1) "no action" which contemplated leaving the Winchester Building in place, and 2) soil excavation requiring Winchester Building demolition and the removal of 1,400 tons of soil. (Table 7a—April 1996) RAP (Pl.'s Ex. 268). The April 1996 RAP did not indicate a preference between these two options but recommended them both "depending upon future land use." (Pl.'s Ex. 268 at 5–19.) At that time, the cost of the "no action" alternative was estimated at $5,000 including the cost of securing an Environmental Land Use Restriction ("ELUR"). The cost of the soil excavation and landfill disposal alternative was estimated at $241,-000. The April 1996 RAP was approved by the DEP on April 17, 1996. (Pl.'s Ex. 285.)

Under the April RAP, Sealy contemplated additional investigation of the site which it intended to undertake in two stages. First, during the Pre–Demolition Investigation stage, Sealy was to further "refine the site's environmental status before demolition occurs, since features and landmarks will be lost after demolition." (Pl.'s Ex. 268 at 2–1.) During the subsequent Pre–Remedial Investigation stage, Sealy was to conduct further investigation to "define existing site soil characterization." (Pl.'s 268 at 2–7.) The scope and cost of the work in terms of the number of proposed soil borings proposed for the Pre–Remedial Investigation differed slightly depending on whether the Winchester Building remained in place or was demolished. (Pl.'s Ex. 268 at Table 1b and 1c.)

The Pre–Demolition Investigation was completed by May 1996. (Pl.'s Ex. 298.) In late summer or early fall of 1996, Devlom decided not to purchase the Winchester Site. In January 1997, Sealy decided to demolish the Winchester Building. Following a meeting with Sealy in January 1997, DEP indicated that Sealy's intention to demolish the building was "appropriate." In March 1997, Hygenetics conducted a Hazardous Materials Investigation of the Building at Sealy's request and thereafter removed the identified hazardous materials (mostly asbestos) from the Winchester Building. Demolition bids were solicited and in July 1997, ABB recommended Manafort Brothers, Inc. as demolition contractor. On July 27, 1997, the Town of Watertown issued an order to show cause why Sealy "should not repair or demolish these buildings that have been deemed hazardous." (Pl.'s Ex. 497.) In November 1997, the Town of Watertown approved Sealy's demolition decision and in January 1998 demolition of the Winchester Building was completed.

Following demolition of the Winchester Building, Sealy undertook the Pre Remedial Investigation ("PRI"), the results of which were presented to the DEP in June 1998. The PRI revealed new contaminants and more severe contamination than was known at the time the April 1996 RAP was prepared. See Pl.'s Ex. 633. The PRI indicated not only heavy metal contamination, but also VOC and PAH contamination that had not been known earlier, as well as a six-fold increase in the volume of contaminated soil (9,000 tons compared to the 1,400 tons originally contemplated).

In September 1998, Sealy submitted its remedial Action Work Plan ("RAWP") (Pl.'s Ex. 662) to the DEP based on the expanded nature of the contamination revealed in the PRI. The RAWP sets out only one alternative to the proposed soil excavation which was a site averaging methodology which would have supported a "no action" alternative for part of the

site but which DEP rejected. In Fall 1998, the Defendants proposed to Sealy the alternative of an engineering cap, an impervious concrete surface. After Sealy had incorporated the engineering cap into the RAWP, DEP indicated its requirements for such option in its November 1998 response comments.

On January 11, 1999, Harding Lawson Associates ("HLA") (formerly ABB) provided Sealy with cost estimates for two engineering cap options which ranged from $1,800,000 to $2,200,000. On January 20, 1999, Garry L. Van Heest from HLA provided Sealy with his estimate of the future costs of the additional future soil excavation of $3,000,000, based on a volume of 9,504 tons. (See Def.'s Ex. 312.) Sealy continued to estimate its costs of completion at $3,000,000 as of April 19, 1999. See Pl.'s Proposed Findings of Fact, Joint Trial Memorandum at ¶ 142 (Doc. # 151).

On April 29, 1999, the DEP approved Sealy's Final Revised RAWP and on May 4, 1999, Sealy began the excavation phase of its remediation plan. Based on further excavation volume revisions as of the time of trial, Sealy estimated its total future remediation costs to be $2,400,000.

### Findings of Fact and Conclusions of Law [4]

#### A. Sealy has substantially complied with the National Contingency Plan

In an action brought under either Section 107(a) or Section 113(f) of CERCLA, 42 U.S.C. § 9607(a) and § 9613(f)(1) respectively, a private party is entitled to recover its necessary and reasonable remediation costs [5] that "are consistent with the national contingency plan" ("NCP"). Defendants claim that Sealy selected its remedial method of soil excava-

tion and off-site disposal long before the site was fully investigated or the extent of contamination was known, at no point in time adequately assessed alternate remedial techniques under the criteria set forth in the NCP regulations, and thus has failed to substantially comply with the NCP and is precluded from recovering its response costs under CERCLA.

Under the NCP, the remediating party is required to conduct a remedial investigation/feasibility study ("RI/FS") in order to "adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). "The national goal of the selection process is to select remedies that are protective of human health and the environment that maintain protection over time, and that minimize untreated waste." 40 C.F.R. § 300.430(a)(1)(i).

In carrying out the remedial investigation (RI), the plaintiff must "conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment." 40 C.F.R. § 300.430(d)(4). During the feasibility study (FS), the plaintiff must develop remedial alternatives reflecting the scope and complexity of the remedial action under consideration based on the site and establish acceptable exposure levels that are protective under the applicable or relevant and appropriate requirements (ARARs) established by federal or state law. Then, these remediation alternatives must be screened in light of effectiveness, implementability and cost, 40 C.F.R. § 300.430(e)(1), (e)(7)(i)-(iii). Finally, a more "detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the

---

**4.** The Court's findings of fact also include any facts contained in the section of this Memorandum of Decision entitled, Site Description and Chronology of Remedial Events. *See supra.*

**5.** Although CERCLA imposes different requirements depending on whether the clean-

up is a "removal" or a "remediation," the parties agree that this action is a remediation since the environmental conditions did not present the imminent and substantial threat to public health required for a removal action under CERCLA.

screening stage." 40 C.F.R. § 300.430(e)(9). During this "detailed analysis" stage, the NCP instructs the remediating party to complete an analysis of the viable alternatives considering the following factors in descending order of importance:

(1) overall protection of human health and the environment;

(2) compliance with ARARs;

(3) long-term effectiveness and performance;

(4) reduction of toxicity, mobility or volume through treatment;

(5) short-term effectiveness;

(6) implementability;

(7) cost;

(8) state acceptance; and

(9) community acceptance.

40 C.F.R. § 300.430(e)(9)(iii).

Based on the numerous site investigations commissioned or utilized by Sealy as reflected in the April 1996 RAP, the Pre–Demolition Investigation Report, the PRI Report and the Final RAWP, it is evident that Sealy has satisfied the purpose of the remedial Investigation component of the NCP in that the Site was adequately characterized such that the efficacy of the remedy selected could be evaluated as being of CERCLA quality.

However, Sealy's admitted failure to conduct a feasibility study identifying and assessing alternate methods of remediation in light of the criteria established by the NCP is a much closer call. By Sealy's own admission, it never prepared any report or document which it considered a feasibility study. Rather, Sealy contends that it otherwise complied with this additional requirement by its ongoing willingness to consider alternative remedial methods as evidenced by its consideration of the "no action" method in the April 1996 RAP, its consideration of "site averaging" as an alternate method of compliance with the RSRs as reflected in the RAWP, and evaluation of the Defendants' proposed engineering cap in January 1999. In re-

sponse, Defendants contend that the evidence demonstrates that Sealy's selection of soil excavation and landfill was predetermined by its plans for the site no later than January 1997, long before the site was fully characterized in June 1998, and that it did not adequately consider other alternatives that would have met the RSRs and been more cost effective.

While Sealy's failure to produce a formal document identified as a feasibility study might be overlooked if there were evidence that Sealy otherwise identified and considered other remedial options under the criteria established by the NCP, such is not the case. First, to the extent the April 1996 RAP does identify leaving the Winchester Building in place as a remedial alternative to soil excavation, such option was only considered and evaluated before the nature and extent of contamination on the site was fully known. Furthermore, while the April 1996 RAP identifies two remedial alternatives and at least superficially addresses some of the criteria set forth in the NCP, it does not reflect how or why the "no action" alternative was ultimately rejected and the Winchester Building was demolished. Although Mr. Van Heest stated that "we [Sealy] discussed biological, chemical and physical techniques generally, and concluded that they didn't even make the first cut here ... [in the April 1996 RAP]," Tr. at 754, there is nothing else in the record reflecting when, how and to what extent these options were ever considered. The inference most reasonably drawn from the chronology of events is that Sealy's decision to demolish the Winchester Building was predominantly driven by factors other than Sealy's remedial investigation and plans.

Second, even though the two RAWPs were developed after the Winchester Site had been fully and accurately characterized, and reference site averaging as an alternate method of compliance with the RSRs, no evidence was adduced that Sealy

considered whether other remedial methods might have been more appropriate in light of the discovery of PAH and VOC contamination, or whether soil excavation remained appropriate after it became apparent that the excavation needs had increased from 1,400 to 8,500 tons. As conceded by Sealy's expert, Garry L. Van Heest, there are remedial technologies suitable for treating VOCs and PAHs that are not suitable for metals. See Tr. at 742. Most troubling is Mr. Van Heest's acknowledgment that his knowledge in 1998 of the contamination was "substantially different than it was in September 1995" as a result of the PRI, see Tr. at 772, and his conclusory explanation that "we looked at the alternative that we had selected and convinced ourselves that it was still the way to go with the site." Tr. at 779. The strong inference from this testimony, that Sealy selected its remedial technique of soil excavation before the site had fully been investigated and then used subsequently-discovered information to support its earlier decisions, is corroborated by Ms. Abram, Sealy's principal decision-maker, who testified that Sealy selected its remedy of demolishing the building in 1997, see Tr. at 424, at which time the Winchester Site was not fully and accurately characterized, as reflected by the June 1998 PRI.

While the trial evidence indicates that Sealy was at least willing to consider and evaluate the cost of an engineering cap when suggested by Defendants, the evidence is insufficient to demonstrate that such an option was adequately considered, instead of being eliminated as an option following a perfunctory or pro forma review. At trial, Ms. Abram testified that the engineering cap option was rejected based on her assessment that the cost "deviation of perhaps a couple of hundred thousand dollars," Tr. at 205, between the engineering cap and the estimate of the proposed soil excavation did not meet the "threshold requirement" established by the DEP, namely that "the cost of remediating the polluted soil is significantly greater than the cost of installing/maintaining engineered control and performing long term post-remediation groundwater monitoring" and that the "significantly greater cost outweighs the risk to human health/environment if the engineered control fails to prevent the mobilization of contaminants." (Jan. 11, 1999 DEP letter (Pl.'s Ex. 717).) No contemporaneously created document memorializes Ms. Abram's consideration and ultimate rejection of the engineered cap as a possible alternative, and the trial evidence indicates that at the time Abram's decision was made, Sealy's internal cost estimate of the soil excavation was approximately $3,095,061. Compared to the engineering cap estimated at $2,400,000 and Ms. Abram's testimony minimizing the cost differential, the evidence shows that an engineering cap might have presented a significant cost savings and been a viable alternative even under the DEP standard. However, at no point did Sealy discuss or pursue the engineering cap option further with DEP.

In summary, the Court concludes from this record that Sealy reversed the proverbial cart and horse by selecting its remedy before this site was fully investigated and then used a post hoc supporting rationale. In enacting CERCLA, Congress recognized the public and environmental benefit of privately initiated or managed cleanups like Sealy's. From the evidence, it is also readily inferable that a private remediator like Sealy has reason to be motivated to proceed directly and promptly with its remediation plans, even before knowing the full extent of contamination, with its remediation plans to reduce the loss of opportunity costs and transaction costs associated with prolonged multiple investigatory and remedial option assessment stages. However, Congress established important procedural safeguards in the NCP as a means of ensuring that the remedy selected is appropriate and cost effective, even given the difficulty of knowing beforehand the extent of contamination. These procedural safeguards provide disci-

pline to an otherwise potentially free wheeling process and greatly facilitate subsequent judicial review of recoverable CERCLA remediation costs. As illustrated by this case, a private mediator's failure to conduct and document a feasibility study necessarily leaves open to speculation whether Sealy's decision-making process was consistent with the goal of the RI/FS requirement or one which is conveniently supported by post hoc rationalizations. The Court finds that Sealy has failed to satisfy its burden of proof of showing even a functional equivalent of the feasibility study requirement imposed by the NCP even considering the RAP, the RAWP and/or other contemporaneous memoranda.

Notwithstanding Sealy's failure of proof in this regard, all is not necessarily lost because CERCLA does not require strict compliance but instead "substantial compliance" with the NCP. Under the regulations:

A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of [40 C.F.R. § 300.700(c) ], and results in a CERCLA-quality cleanup.

40 C.F.R. § 300.700(c)(3)(i). Response actions will not be considered inconsistent with the NCP based on immaterial or insubstantial deviations from the NCP. 40 C.F.R. § 300.700(c)(4).

Paragraphs (5) and (6) of 40 C.F.R. § 300.700(c) require that, in addition to performing the RI/FS, the remediating party: (1) provide for worker health and safety (40 C.F.R. § 300.150); (2) document the costs incurred during remediation (40 C.F.R. § 300.160); (3) identify any applicable or relevant and appropriate requirements ("ARARs") (40 C.F.R. § 300.400(g)); (4) provide reports of releases of hazardous materials (40 C.F.R. § 300.405(b),(c) and (d)); (5) perform a remedial preliminary assessment and a remedial site inspection (40 C.F.R.

§ 300.420); (6) conduct a remedial preliminary assessment and a remedial site inspection (40 C.F.R. § 300.430); (7) develop a remedial design consistent with the selected remedy and implement the remedial action (40 C.F.R. § 300.435); and (8) provide for public comment and community relations (40 C.F.R. §§ 300.155; 300.430(c); 300.430(f)(2), (3), and (6); 300.435(c)).

Defendants rely on several cases precluding cost recovery under CERCLA because of the plaintiff's failure to prepare a RI/FS or where plaintiff's RI/FS did not adequately consider the alternatives. *See Union Pac. R.R. Co. v. Reilly Indus., Inc.,* 981 F.Supp. 1229 (D.Minn.1997) (finding plaintiff failed to prepare RI/FS for two alternate methods); *Public Serv. Co. of Colorado v. Gates Rubber Co.,* 22 F.Supp.2d 1180 (D.Colo.1997) (despite plaintiff's attempt to compare costs of various remedial alternatives, court found RI/FS non-compliance based on failure to conduct more than a preliminary assessment); *Yellow Freight System, Inc. v. ACF Indus., Inc.,* 909 F.Supp. 1290 (E.D.Mo.1995) (finding plaintiff's pre-demolition failure to outline the kinds of alternate cleanup methods including "no action" did not meet the strict compliance standards of the 1985 NCP which did not permit "substantial compliance"); *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373 (E.D.N.C.1990) (finding non-compliance where plaintiff did not perform any documented or detailed cost analysis of alternate remedies including "no action").

Notably, all of these cases where the courts have found the plaintiff's RI/FS non-compliance inconsistent with the NCP involved additional non-compliance with other NCP requirements as well, most typically the public comment requirement. *See e.q. Public Serv. Co. of Colorado v. Gates Rubber Co.,* 22 F.Supp.2d 1180, 1194 (D.Colo.1997) ("It is the conjunction of [plaintiff's] insufficient remedial investigation/feasibility study and its meager at-

tempt to fulfill the public comment requirement which makes [plaintiff] unable to substantially comply with the NCP as a whole."); *Washington State Dept. of Transport. v. Washington Natural Gas Co.*, 59 F.3d 793 (9th Cir.1995) (inconsistency found in "looking at the situation as a whole," including only briefly addressing alternatives with the state agency, failing to reassess alternatives after discovery of more contaminants and failing to provide opportunity for public review); *Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 477 (E.D.Mich.1993) ("[e]ven though the lack of public comment alone would bar recovery," the City's cost recovery action was barred for failure to conduct a detailed analysis or consideration of other remedies).

In contrast to these cases, with the exception of the feasibility study, Sealy has otherwise complied with all the requirements imposed by paragraphs (5) and (6) of 40 C.F.R. § 300.700(c). Defendants do not dispute that Sealy has fully and accurately investigated the site and has properly identified the Connecticut RSRs as the relevant ARARs. *See* 40 C.F.R. § 300.430(g). With respect to the requirement of opportunity for public comment, the record clearly shows active DEP review of and comment on Sealy's plans throughout Sealy's remediation process. Moreover, Sealy has consistently provided Defendants with notice of each stage of its remedial efforts and on occasion has modified or adjusted plans based on Defendants' comments. Furthermore, Sealy presented aspects of its remediation plans to the Town of Watertown through a series of public hearings held in connection with its application for demolition and work permits.

Finally and perhaps most importantly, while Sealy's rejection of the engineering cap in January 1999 might not have been justifiable solely based on a comparison of costs, there was no evidence of the existence of any other significantly more cost effective permanent remedial alternative that would have complied with the RSRs. At trial, the cost of the engineering cap was shown to be nearly identical to the present estimated cost of the proposed excavation. While Defendants have disputed the necessity of the extent of soil to be excavated, there is no evidence that there exists a significantly more cost effective, permanent remedy that would comply with the RSRs.

■ In light of the Second Circuit's oft-cited instruction: "[i]t was Congress' intent that CERCLA be construed liberally to accomplish [the statute's] goals," *Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir.1999), the Court concludes that in this case, Sealy has "substantially complied" with the NCP. To preclude Sealy from recovery based on its failure to prepare a feasibility study under these circumstances "would ignore the equitable component that Congress and the EPA built into the cleanup costs decisions." *Id.*

### B. Only "necessary" costs may be recovered under CERCLA

Having concluded that Sealy has substantially complied with the NCP, the Court next considers which remedial costs are "necessary" to address the threat to public health or environment. Sealy seeks to recover $1,813,744.81 in costs it has already expended in connection with its remedial efforts as well as a declaration that it may recover its estimated future costs up to $2,400,000 to complete its proposed soil excavation.

#### 1. Costs to Date

#### a. Demolition costs were not a necessary part of remediation

Sealy seeks to recover its costs for demolishing the Winchester Building, as a necessary cost of its remediation and/or its site investigation. Defendants challenge the recoverability of any demolition costs on the grounds that Sealy's decision to demolish the Winchester Building was motivated by business interests in selling the

Winchester Site or avoiding ongoing capital expenditures, coupled with compliance with municipal orders, rather than necessary to the remediation. Defendants argue that Sealy is improperly using CERCLA as a device for requiring defendants to share the expense of improving, not remediating, its property. Such a potential abuse of CERCLA was identified in *G.J. Leasing Co., Inc. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir.1995):

> Suppose a building that was being used to warehouse heavy industrial equipment were found to have very low levels of contamination by some hazardous substance and only a small expenditure would be necessary to remove enough of the substance to make the building safe for its current use. Thinking this a perfect opportunity to upgrade that use, the owners decide to incur enormous costs to eliminate the contamination utterly, charge those costs to whoever was responsible for the current very low level of contamination, and then convert the building to a hospital, day care center, or dairy products plant. The limitation to "necessary" response costs would deter them from carrying out this scheme.

At trial, it was evident that Sealy's decision to demolish the Winchester Building was made no later than January 1997 as evidenced by its informing DEP of its intent to demolish the building. It was also evident that Sealy's decision to demolish the building was based on its business determination that the Winchester Building had become a "money pit" as a result of five and a half years of deferred maintenance since Litton vacated the Site in 1991, the potential risk of liability as an attractive nuisance to trespassers and vandals, (*see* Defs.' Ex. 403—handwritten note by Attorney De Rosa, Sealy's outside counsel indicating "demolition" with an arrow towards "liability"), and the going forward costs of maintaining the building in an acceptable state of repair. While the demolition may have had coincidental benefits in making the Winchester Site more

accessible for further investigatory testing beyond that could have been done with difficulty by Tighe and Bond, such benefits were never articulated contemporaneously with the decision to demolish the Winchester Building. Rather, there is ample evidence suggesting that Sealy's decision to demolish was driven by its efforts to sell the Winchester Site. Ms. Abram testified that after the proposed sale with Devlom fell apart, Sealy reevaluated whether the demolition made any sense. Tr. at 120. *See also* Pl.'s Ex. 402—(Ms. De Rosa's notes of her meeting with DEP on September 9, 1996 indicating: "I explained to Rich [Hathaway, from DEP] that we are looking for a new buyer and do not want to actively do any further work until we have a new buyer and can assess the buyer's requirements for the property, for example, do they want all of the buildings demolished or do they want to use one of the buildings?"). Mr. Van Heest's 1999 opinion that the demolition was necessary and required for the remediation was not held by him at the time the building was demolished nor was such an opinion memorialized by anyone else at the time. Tr. at 709–10 (Mr. Van Heest testified "I don't believe I had the opinion at the time we demolished the building." "At the time the building was demolished, we had not performed all the investigations to—I mean, I wasn't in position to render an opinion when we demolished the building.").

Sealy also claimed its decision to demolish the Winchester Building was based on an order to show cause from the Town of Watertown to either demolish or repair the building. *See* Pl.'s Ex. 497 (Fusco Letter dated Aug. 22, 1997); Tr. at 496. Not only would compliance with this municipal order not be a "necessary response cost" because the order was directed to public safety concerns other than contamination, the record indicates that Sealy had already decided to demolish the building more than seven months before any such notice was issued and had received a bid and recommendation of Manafort, a demolition

contractor, contemporaneously with issuance of such notice. Finally, the Town of Watertown notice did not mandate demolition but also provided Sealy with the option to repair the Winchester Building. While the building posed public safety concerns and was a source of potential liability, the Court does not find plaintiff has demonstrated the demolition was a necessary response cost of the remediation efforts related to the contamination of the soil or the ground water within the contemplation of CERCLA or Conn.Gen.Stat. § 22a–452.

 As a result, Sealy may not recover costs incurred in the demolition of the Winchester Building, costs associated with obtaining town approval, the hazardous material investigation, asbestos removal and fees paid to their outside consultants related only to the demolition. *See Plaskon Elec. Materials Inc. v. Allied–Signal, Inc.*, 904 F.Supp. 644, 663 (N.D.Ohio 1995) (recovery of demolition costs precluded where evidence showed plaintiff had demolished the buildings "in an effort to improve the aesthetics and marketability of the Site after the cessation of the manufacturing operations"); *Yellow Freight*, 909 F.Supp. at 1290–99 (plaintiff's removal of asbestos material from purchased buildings held to be unnecessary in light of evidence that plaintiff removed asbestos from buildings primarily to improve site and make it more useful for its trucking operations). Therefore, Sealy may not recover its payments to 1) Manafort for Phase I demolition ($486,100) and asbestos removal ($37,467; and 2) Safe Environment of America, Inc. for asbestos removal ($328,268), totaling $851,935. However, Sealy may recover $33,436.30 paid Manafort to remove the underground storage tanks that furthered the remediation effort of the Winchester Site.

### b. Other consultant fees and expenses incurred in connection with the remediation

Defendants contend that Sealy's cost recovery claims or portions thereof relating to fees paid Attorney Franca DeRosa, ABB Environmental Services/Harding Lawson Associates, ("ABB/HLA"), Dames & Moore, Clean Harbors Environmental Services and Fletcher–Thompson, Inc. are not recoverable because they are not closely tied to the actual cleanup of the property but instead relate to the costs of this litigation effort or have not been demonstrated to be closely tied to the actual cleanup. Defendants do not contest Sealy's recovery of the $106 Sanborn Mapping fee.

### (i) Attorney De Rosa's Fees

Sealy seeks recovery of $81,331.06, representing a portion of the fees paid to Attorney De Rosa from April 30, 1996 through August 31, 1998. Attorney De Rosa, originally with the firm of Schatz, Schatz, Ribicoff & Kotkin and now a partner with Brown, Rudnick, Freed & Gesmer, was first retained by Sealy in 1993 and by her own account has served a multitude of roles for Sealy in connection with this site, its remediation and this litigation. As Sealy's main environmental counsel, she served as liaison with various regulatory agencies, shepherding Sealy's remedial plan through the multiple stages of DEP approval during a period when its RSRs were being finalized. She also facilitated issuance of a demolition permit for Sealy from the Town of Watertown for the Winchester Building. In addition, she was involved in this response cost litigation. She also performed some role in connection with the aborted Devlom sale.

Sealy does not seek to recover all of Attorney DeRosa's fees, but only that subset of her fees it claims are associated solely with her remediation related activities. Defendants contend that DeRosa's fees cannot be recovered as a necessary response cost in a private CERCLA action as a matter of law under the standard set forth by the Supreme Court in *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994).

*Key Tronic* held that CERCLA did not authorize an award of attorney fees associated with litigating a private party's cost recovery action under CERCLA. *Id.* at 819, 114 S.Ct. 1960. However, *Key Tronic* distinguishes between a traditional attorney litigation fee award and the recoverability of fees for work directly related to and advancing the remediation efforts. In distinguishing between the two roles, the Supreme Court noted:

> [S]ome lawyer's work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B). The component of Key Tronic's claim that covers work performed in identifying other potentially responsible parties falls in this category ... [T]hese efforts might well be performed by engineers, chemists, private investigators or other professionals who are not lawyers. As the Tenth Circuit has observed, the American rule [requiring statutory authority for fee shifting] ... does not govern such fees because they are not incurred in pursuing litigation ... Tracking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. Key Tronic is therefore quite right to claim that such efforts significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs. These kinds of activities are recoverable costs of response clearly distinguishable from litigation costs.

This distinction turned on whether the attorney's activity "primarily served to protect the plaintiff's interests regarding its own liability for the cleanup." *Id.* at 820–21, 114 S.Ct. 1960 (precluding recovery on non-litigation fees incurred in negotiating a consent decree with the EPA).

First, Defendants contend that Attorney DeRosa's fees are not recoverable since her legal work and advice as a lawyer could not be done by non-lawyers. Second, they assert that even if DeRosa's activities were related to the remediation, they were primarily directed to protecting Sealy's interests, which Attorney DeRosa correctly acknowledged was generally the obligation of any attorney representing a client. Finally, Defendants maintain that even if such activities could be recoverable as a matter of law, Sealy has failed to adequately segregate and differentiate between activities closely related to the mediation and her role in the cost recovery litigation.

■ . To be recoverable under CERCLA, fees for an attorney's work must therefore be closely tied to the actual cleanup, must benefit the entire cleanup and not cost allocation or liability shifting, and cannot be primarily protective of the plaintiff's interests. *See also* Lana Knedlik, *Attorneys Fees in Private Cost Recovery Actions Under CERCLA: The Key Tronic Decision,* 44 U.Kan.L.Rev. 365, 393 (1996) (identifying the types of work for which fees could properly be recoverable under CERCLA as including " ... designing a removal action, drafting contracts with environmental professionals to perform the removal work, and monitoring the work progress"); *In re Combustion,* 968 F.Supp. 1112, 1115 (W.D.La.1996) (*Key Tronic* limits CERCLA private action recovery for response costs to "[a]ctivities financed by private litigants that are closely tied to the actual cleanup, significantly benefit the entire cleanup, and serve a statutory purpose by facilitating a prompt and effective cleanup").

The only Second Circuit case analyzing *Key Tronic* is *Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir.1998), which directs that "the key inquiry for courts to examine carefully is the exact type of legal services covered by the fee." *Id.* at 430 (remanding to the district court for initial determination as to whether legal fees paid to regain possession of the site are recoverable under CERCLA). Lower courts outside this Circuit applying the *Key Tronic* standard have found the following types of attorney fees to be recoverable: (1) those

incurred in connection with a PRP search, *United States v. Atlas Minerals and Chems., Inc.*, 1995 WL 510304 (E.D.Pa. 1995); *In re Combustion*, 968 F.Supp. 1112, 1115 (W.D.La.1996); *but see Ekotek Site PRP Committee v. Self*, 1 F.Supp.2d 1282, 1294 (D.Ut.1998) (finding plaintiff's maintenance of extensive PRP database for several years not recoverable since purpose related to reallocation of costs); (2) fees related to client conferences regarding site work and cleanup matters, site visits to review cleanup and conferences with technical staff, *In re Combustion*, 968 F.Supp. at 1115 (W.D.La.1996); (3) fees associated with investigatory efforts to identify contaminants on the property, *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 937 (8th Cir.1995); *In re Combustion*, 968 F.Supp. at 1115 (W.D.La. 1996); and (4) fees related to costs of EPA monitoring or oversight of remedial action, *Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564 (10th Cir.1996). In contrast, the following types of costs have been found not recoverable under CERCLA: (1) costs incurred in negotiating a consent decree with the EPA, *Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564 (10th Cir.1996); and (2) costs of audits conducted by plaintiff committee of PRPs to review expenses charged by EPA to committee with regard to the cleanup, *Ekotek Site PRP Committee v. Self*, 1 F.Supp.2d 1282, 1294 (D.Ut.1998) (finding "audits were not necessary to the cleanup, but concerned how much plaintiff actually owed with respect to that cleanup").

■ Applying these parameters, the Court finds Sealy has satisfactorily demonstrated that there are non-litigation fees paid to Attorney DeRosa which ·closely correspond to actual remediation and thus are recoverable. Specifically, the Court finds that Attorney DeRosa's liaison work with EPA and DEP utilizing her familiarity with the governmental processes and personalities involved with Sealy's cleanup process to shepherd the remediation through the plan submission, review and the approval process insured and enhanced the speed and efficacy of the remedial plan implementation. Moreover, her specialized knowledge of the environmental regulatory scheme and her prior involvement with other remediations qualified her to guide development of remedial action plans and work plans in compliance with the RSRs. Although compliance with the RSRs is a prerequisite for cost recovery, the Court does not find these activities by Attorney DeRosa were undertaken primarily for Sealy's benefit, or to reallocate the cost of cleanup, but rather to facilitate and expedite compliance with the statutory requirement that the cleanup comply with the local environmental standards and thus serve CERCLA's statutory purpose.

■ While the demarcation between litigation and remediation related activities can be difficult, Attorney DeRosa contemporaneously attempted to draw this distinction among her multiple roles in anticipation of this proof problem. She charged her litigation and remediation tasks to separate billing codes, describing the nature of her work with the *Key Tronic* decision in mind. Moreover, Attorney DeRosa subsequently reviewed her time records at her deposition, in preparation for trial, and even during trial and excised numerous entries which could not be substantiated as remediation related. Notwithstanding the Defendants' attempts to challenge Attorney DeRosa's ability to accurately segregate her work in this way, the Court finds that this process resulted in a record from which the Court can reasonably assess whether her non-litigation activities were closely tied to the actual cleanup. The Court also finds the hourly rate charged by De Rosa during the course of this litigation ($150 and $180 with 10% discount) to be a reasonable rate based on her typical hourly rate as a partner in a law firm and the Court's generalized knowledge of local rates in this District based on other fee petitions it has reviewed. *See Ass'n For Retarded Citizens*

*of Connecticut, Inc. v. Thorne,* 68 F.3d 547, 554 (2d Cir.1995) (recognizing judge may rely in part on his or her own knowledge of private firm hourly rates in the community).

However, after reviewing the Attorney DeRosa's time records, the Court concludes that the following entries were not demonstrated to be related to remedial activities and therefore may not be recovered by Sealy as response costs.

**(1) Fees Related to Devlom Sale**

In prior iterations of the fees sought, Sealy sought to recover fees for some of DeRosa's activities related to the negotiations for sale of the Winchester Building to Devlom and/or another third party. By the conclusion of trial, all such entries were withdrawn.

**(2) Fees Related to Demolition activities**

Since the Court finds that the demolition of the Winchester Building was not a necessary part of the remediation, the Court has eliminated entries totaling $52,426, that appear limited to Attorney DeRosa's activities relating to the demolition. See Appendix A for itemized listing of entries disallowed.

**(3) Fees relating to Litigation activities**

■ The Court finds that some of Attorney De Rosa's claimed fees appear to relate to the pending litigation and are therefore not recoverable under *Key Tronic*. Specifically, those entries indicating Attorney De Rosa's contact with Sealy's litigation counsel Attorney Peter Nolin and Defendants' counsel, and legal research totaling $4,324 have been eliminated. See Appendix B for itemized listing of disallowed entries.

**(4) Fees corresponding to documents where privileges were asserted up to and throughout part of trial**

Before and during trial, Sealy asserted work product and/or attorney client privi-

lege with respect to certain documents corresponding to entries for which reimbursement was sought. Defendants filed a motion to compel production of those documents. See Doc. # 166. After much effort by the parties and the Court, these claims were winnowed down to 13 documents. Finally, midway through trial, Sealy agreed to produce all the documents or withdraw its claim for reimbursement on entries as to which it still maintained any claim of attorney client privilege. To alleviate any potential prejudice to Defendants from Sealy's late disclosure of any documents to which Sealy previously asserted any privilege, the Court awarded Defendants additional time in this clocked bench trial which provided them time to cross-examine Ms. DeRosa or use as they otherwise saw fit.

**(5) Portion of fees relating to unsubstantiated overhead costs and expenses**

■ Finally, Sealy seeks recovery for miscellaneous costs of photocopying, faxing, travel, food and other expenses but has failed to substantiate the basis for such expenses or demonstrate how such costs should be attributed to Attorney DeRosa's remedial efforts versus her litigation activities. Given Sealy's failure to segregate these expenses from DeRosa's litigation work or clearly identify the basis for their recovery, these costs totaling $4,727 are precluded from recovery. See *Ekotek Site PRP Committee, Inc. v. Self,* 1 F.Supp.2d 1282, 1294 (D.Utah 1998) (Recovery disallowed where "plaintiff has not met its burden of affirmatively proving that any particular portion of the disputed cost items were necessary response costs"). See Appendix C for itemized listing of disallowed entries.

*Summary of De Rosa Fees*

Accordingly, Sealy may only recover $19,854 for services rendered by Attorney

De Rosa which the Court finds were activities closely related to and beneficial to the cleanup, notwithstanding some beneficial result which may have inured to Sealy's litigation. See Appendix D for calculation of fees allowed.

### (ii) ABB and HLA fees

Sealy seeks to recover $801,326.65 of the amount to date paid to ABB/HLA, its prime environmental consultant for a variety of services. Given the Court's finding that the demolition of the Winchester Building was not a necessary cost of the remediation, the following fees paid to Harding Lawson Associates (formerly ABB) are not recoverable since they were only incurred as a consequence of the demolition: Parcel Demolition Estimate— $4,907.97, Parcel HMI—$27,355.89; Remediation/Demolition oversight[6]—252,-164.84.

Absent any challenge by Defendants, Sealy may recover costs paid for: groundwater assessment—$12,607; well abandonment—$3,746.82; planning, permitting and engineering—$89,784.10; supervision of underground storage tank removal—$6,344.28; and the remedial action work plan—$14,887.85. Sealy may also recover $91,968.68 for the remedial action plan preparation, remedial action plan revision and pre-demolition investigation cost representing the amount requested less $15,-526.14 reflected in invoices No. 52192 (Pl.'s Ex. 875) and No. 56710 (Pl.'s Ex. 883), which Sealy marked pre-trial for identification purposes but did not offer as evidence at trial. Sealy may only recover $46,-955.44 for ABB/HLA's activities relating to the Tighe & Bond Work Implementation since Sealy can not recover for Invoice No. 49965 (Pl.'s Ex. 870) absent any explanatory cover letter or testimony describing the services rendered by ABB/HLA as re-

flected in this invoice. The July 24, 1995 cover letter from Mr. Van Heest to Sealy accompanying Invoice No. 49965 and Invoice No. 49974, see Pl.'s Ex. 870, only describes the services ABB/HLA rendered during the period from June 12 through July 14, 1995, the period reflected by Invoice No. 49974. There is no indication of what services were performed during the period ending June 9, 1995, the period reflected by Invoice No. 49965. Since Sealy failed to itemize or otherwise indicate what services were rendered by ABB/HLA during the period reflected by Invoice No. 49965, the fees reflected in this invoice ($15,514.56) cannot be recovered in this action.

■ Finally, the Court finds that Sealy may recover the cost of the Pre-Remedial Investigation which totaled $219,662.45. (Pl.'s Ex. 884–90.) Although Defendants contend that the Court should discount the amount sought based on the fact that the scope of the Pre-Remedial Investigation was more extensive due to Sealy's prior decision to demolish the Winchester Building, the Court finds that the scope of the Pre-Remedial Investigation was reasonable and necessary, particularly in light of the fact that the DEP required additional testing. Even though the Court has previously found the demolition was not necessary for the remediation, it does not necessarily follow that the resulting increase in the number of soil borings that became feasible without the building is therefore unreasonable. In fact, the April 1996 RAP contemplated more extensive investigation of the soil, 113 borings compared to 24 borings, if the building was no longer present. The additional site investigation was conducted in response to DEP's request for expanded investigation. On this basis, the Court concludes that there is no sound

---

**6.** Although these invoices (see Pl.'s Ex. 855–66) reflect some potentially recoverable remediation work commingled with demolition related activities, Sealy's failure to itemize the fees charged by ABB/HLAs for these different activities makes it impossible for the

Court to discern which activities might be reimbursable. Therefore, the Court finds Sealy has failed to carry its burden of proof demonstrating these costs were tied to the remediation.

basis for discounting the cost of the Pre–Remedial Investigation using the arbitrary percentage proposed by Defendants. Therefore, Sealy may recover the full $219,662.45 sought for fees paid to ABB/HLA for Pre–Remedial investigations. (Pl.'s Ex. 884–90).

*Summary of ABB/HLA Fees*

In summary, the Court finds that Sealy may recover $485,957.25 for ABB/HLA's services to date as necessary costs for activities closely tied and beneficial to the actual cleanup, apart from any benefit they may have also had for Sealy for purposes of this litigation.

### (iii) Dames & Moore

■ Sealy seeks to recover $28,467.30 paid to Dames & Moore related to site investigation activities. Defendants do not challenge the amount requested for Site Reconnaissance ($1,231.07) or Subsurface Investigation ($16,740.36), or a portion of the fees paid for the Technical Work Plan. However, defendants object to Invoice Nos. 036–3175 and 036–03255 (Pl.'s Ex. 980 and 981, totaling $4,889.61) claiming that Dames & Moore's work was related to its role as litigation support. Defendants are clearly correct. The request for payment included with Invoice No. 036–03175 states that the purpose of the work was for "Winchester/Litton litigation." (Pl.'s Ex. 980.) In addition, the cover letter dated February 15, 1994 describes the nature of the services rendered as including: "Meet with Sealy and outside counsel to review/finalize draft complaint." Similarly the cover letter accompanying Invoice No. 036–03255 states that Dames & Moore was providing "litigation support" and the purpose of its work was "to minimize Sealy's environmental liability risks." (Pl.'s Ex. 981.) From these facts, the Court concludes Sealy has not demonstrated that the services reflected by these two Dames & Moore invoices were incurred as a necessary response costs, but rather that they were incurred as part of its attempt to minimize its own share of the liability in furtherance of its litigation position. Therefore, Sealy may only recover $23,577.69 of the fees paid Dames & Moore.

### (iv) Fletcher–Thompson, Inc.

■ Sealy also seeks to recover $12,000 paid to Fletcher–Thompson to prepare a historical chronology of the Winchester Site including identification of past owners and activities which took place on the Winchester Site. Defendants contend that this work was for litigation purposes. *See* Def.'s Ex. 144 (Sealy's Jan. 4, 1996 letter to Devlom) (indicating this document was "prepared for Sealy in anticipation of and as part of Sealy's litigation effort"). While the historical chronology may have initially been commissioned for the litigation, under the *Key Tronic* standard, such an initial purpose does not preclude recovery absolutely if the chronology served a purpose directly related to the clean-up process. Like the search for PRPs which *Key Tronic* found to be recoverable, the chronology helped Sealy ascertain potential contamination sources and locations based on the past industrial activities which were conducted on the Winchester Site. Under these circumstances, the Court finds that Sealy may recover the cost paid to Fletcher Thompson as a cost closely tied to the actual cleanup notwithstanding any coincidental litigation benefit or purpose such study might have had.

### (v) Clean Harbors Environmental Services

■ Sealy also seeks to recover $5,242.50 it paid to Clean Harbors Environmental Services to dispose of certain unspecified materials left on the site in the summer and fall of 1994. At trial, Ms. Abram could not recall with sufficient precision what types of materials were disposed of and whether the materials were removed from the Winchester Building or the building on the adjacent Sealy Site. (Tr. at 278.) Given the lack of clarity as to what materials were removed, from where

the materials were removed, and the source of these materials, the Court finds that Sealy has not sustained its burden of showing that these costs were necessitated by the remediation and such costs will not be recoverable.

### Summary of Recoverable Costs to date

Based on the foregoing, the Court finds Sealy may recover a total of $574,931.24 as response costs to date under CERCLA and/or Conn.Gen.Stat. § 22a–452:

| | |
|---|---|
| Manafort (UST removal only) | $ 33,436.30 |
| Attorney De Rosa | $ 19,854.00 |
| ABB/HLA | $485,957.25 |
| Dames & Moore | $ 23,577.69 |
| Fletcher–Thompson, Inc. | $ 12,000.00 |
| Sanborn Mapping | $ 106.00 |
| TOTAL | $574,931.24 |

### C. Recovery for Future Costs of Excavation

At trial, Defendants' expert Mr. William T. West challenged the scope of the soil excavation work outlined in Sealy's RAWP. Mr. West did not challenge the RSRs selected by Sealy nor the unit costs assumed in Sealy's cost estimate, but only the volumes of soil Sealy intends to excavate from various locations.

Under Mr. West's approach, Sealy could excavate less soil, use more Environmental Land Use Restrictions ("ELURs") and still comply with the RSRs. Mr. West testified that in each of the eight excavation areas, Sealy could comply with the Connecticut RSRs without excavating as deeply or as broadly as planned by Sealy. While Mr. West indicated that the soil boring data could indicate anticipated patterns of contamination, he did not precisely relate this data to the specific excavation proposed. The difference between Mr. West's approach and that currently underway is only a matter of degree. Mr. West's approach contemplates less initial excavation, followed by peripheral soil sampling and then additional excavation if required. Sealy's approach calls for more extensive and invasive excavation up-front. Mr. West quantifies the cost of his approach as reducing the cost of excavation from Sealy's $2,400,000 to $1,600,000 (assuming that no additional excavation was needed under his approach).

Although Mr. West's approach was theoretically well reasoned, this reasonableness does not render the approach selected by Sealy to be necessarily unreasonable. While Sealy's proposed excavation will require initial excavation of greater soil volumes, i.e. excavating a foot deeper in certain areas or a foot wider in others, Mr. West's approach is not without potential for significant cost overruns. By curtailing the scope of the initial excavation in areas of known contamination, the West peripheral testing would be of soil which would have been removed under the Sealy approach. If such testing showed further exceedances, additional soil would have to be removed, increasing the cost in terms of both delay and expenditures. Thus, Mr. West's proposed approach does not eliminate the potential for similar amounts of excavation, but at greater cost and prolongation of remediation. Moreover, Sealy's RAWP has already been approved by the DEP and has already secured the benefit of community acceptance. Mr. West was unable to opine whether or not his plan would gain DEP approval or community acceptance. Finally, Sealy has actually revised the scope of its excavation plan, adopting certain aspects of Mr. West's deposition opinions, and as a result has reduced the volume of soils to be removed and has employed ELURs in certain regions where it deems them to be appropriate. Tr. at 211. *See also* Pl.'s Ex. 752. In short, under these circumstances, while the Court finds the two approaches to be both feasible plans for remediating the soil contamination, the one selected by Sealy is not unreasonable or demonstratably substantially more costly in terms of either money or time. Accordingly, the Court finds that Sealy may recover as future remediation costs up to $2,400,000

based on the soil excavation under its RAWP.

■ The one aspect of Mr. West's opinion that warrants separate consideration is his view that the $187,000 estimated cost of final regrading of the site is not necessary for the remediation. While it is clear that CERCLA may not be employed by the remediating party to shift the costs of improving its site for new or changed uses, *see e.g., G.J. Leasing Co. Inc. v. Union Elect. Co.*, 54 F.3d 379, 386 (7th Cir.1995), nothing suggests that Sealy's final regrading plan is inconsistent with its existing use as an industrial property, but instead that the final regrading was a condition placed on the remediation project by the Town of Watertown before issuing the work permit. While the scope of the final regrading plan might be more than otherwise technically necessary to accomplish a strictly RSR compliant remediation, the Court does not find the scope of the regrading proposed in the RAWP to be unreasonable in light of the premium placed on community acceptance of the remediation in the CERCLA process. This visible site fronts on a public park, war memorial and major thoroughfare which undoubtedly underpinned the regrading condition imposed by the Town of Winchester. Therefore, Sealy may recover the incremental cost of the final site regrading contemplated by the RAWP.

### Costs Recoverable Under Conn.Gen. Stat. § 22a–452

The response costs incurred by Sealy may also be recoverable under Stat. § 22a–452, which similarly limits recovery to reasonable costs expended for mitigation, remediation or collection. Since those costs discussed above which were found necessary for CERCLA purposes would be reasonable for state statutory

purposes, these costs could be recovered under the state statute assuming liability can be demonstrated.[7] The Court has also considered whether any of the costs found not to be recoverable under CERCLA might nonetheless be recoverable under the state claim, but given the similarity between the statutes, the Court concludes that the same analysis controls the quantum of damages that could be recovered under state law.

### CONCLUSION

For the foregoing reasons, the Court finds that $574,931.24 in costs expended to date and up to $2,400,000 in future costs are recoverable as reasonable remediation costs for the Winchester site under CERCLA, 42 U.S.C. § 9601, *et seq.*, and/or Conn.Gen.Stat. § 22a–452.

IT IS SO ORDERED.

---

7. Section 22a–452(a) only provides for reimbursement for contamination removal costs where the pollution or contamination resulted from "the negligence or other actions of such person, firm or corporation." *Connecticut*

*Resources Recovery Authority v. Refuse Gardens, Inc.*, 43 Conn.Supp. 83, 642 A.2d 762 (1993), 9 Conn.L.Rptr. 77, aff'd. 229 Conn. 455, 642 A.2d 697 (1994).